UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABCDE OPERATING, LLC,

      Plaintiff,

v.

CITY OF DETROIT, *et al.,*

      Defendants.

_____/

Case No. 14-13158

Honorable Nancy G. Edmunds


**OPINION AND ORDER REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT [52, 53, 55, 75]**

      Plaintiff ABCDE Operating, LLC, doing business as the Penthouse Club, commenced

this suit in this Court on August 15, 2014, alleging that the Defendant City of Detroit and

a number of individual Defendant officers in the Detroit Police Department ("DPD") violated

Plaintiff's rights under the First and Fourth Amendments to the U.S. Constitution by

conducting warrantless and suspicionless raids of Plaintiff's adult entertainment club in

retaliation against Plaintiff's exercise of its First Amendment rights.[1]  Specifically, Plaintiff

alleges that the first of these challenged raids occurred in January of 2014, shortly after

Plaintiff wrote to the Detroit Chief of Police complaining of increased police investigations

of adult entertainment facilities, and that DPD officers conducted a number of additional

raids after Plaintiff brought this suit and began actively pursuing discovery in support of its

---

     [1]The initial complaint in this case named two other adult entertainment clubs as
plaintiffs, but these clubs have since been dismissed as parties, leaving the Penthouse
Club as the sole remaining plaintiff.  Similarly, the initial complaint identified nine
individual DPD officers as defendants, but Plaintiff's fourth amended complaint now
names the City of Detroit and 23 individual DPD officers as defendants.

claims.  In Plaintiff's view, the Defendant City and officers conducted these raids in retaliation against Plaintiff's exercise of its constitutionally protected rights to free speech and to seek redress from the courts, and the manner in which these raids were carried out violated the constitutional guarantee against unreasonable searches and seizures.

Four dispositive motions presently are pending before the Court.  First, the Defendant City and its officers seek the dismissal of Plaintiff's claims or, alternatively, an award of summary judgment in their favor as to each of these claims,[2] arguing primarily (i) that the Defendant officers were entitled to enter the public areas of Plaintiff's club without a warrant, (ii) that the officers did not exceed the scope of their lawful authority while on Plaintiff's premises as they carried out administrative inspections and engaged in other legitimate law enforcement activities, (iii) that to the extent any Defendant officers might have violated any constitutional principles, these officers nonetheless would be entitled to qualified immunity from liability, and (iv) that Plaintiff cannot show that any constitutional violations are attributable to a municipal custom or policy, as necessary to hold the Defendant City liable for these alleged violations.[3]  For its part, Plaintiff has filed two

---

[2]To be accurate, this motion has been brought by the Defendant City and 16 of the 23 individual DPD officers named as defendants.  The seven remaining defendant officers named in Plaintiff's fourth amended complaint — Jeffrey Banks, Larry Barnett, Jeffrey Duley, Donte Jenkins, Arthur Leavell, Steven Riley, and Holly Reed — have not yet appeared in this suit, and there is no evidence in the record that these individuals were served with summonses or copies of the complaint.  Accordingly, the claims against these individuals will be dismissed without prejudice.

[3]The brief in support of Defendants' motion is 69 pages in length, well in excess of the 25-page limit imposed under Local Rule 7.1(d)(3)(A) of this District.  In recognition of this, Defendants' motion is accompanied by an *ex parte* application to file a brief in excess of the 25-page limit.  In response, Plaintiff has filed a motion to strike all pages of Defendants' summary judgment brief beyond this 25-page limit, arguing that Defendants have failed to identify a sufficient reason for submitting a brief that is nearly

motions for partial summary judgment, contending (i) that its constitutional rights were violated by virtue of a City of Detroit custom authorizing warrantless, suspicionless enforcement actions against adult entertainment venues located in the City, and (ii) that three particular Defendant police officers who led and participated in the warrantless raids of Plaintiff's club engaged in unlawful activities that violated Plaintiff's constitutional rights as a matter of law. Finally, Plaintiff contends in a more recent motion that under principles of issue preclusion, a state court ruling in a criminal proceeding brought against one of Plaintiff's employees prevents the Defendant City and three of the Defendant officers from relitigating the lawfulness of the December 2015 raid of Plaintiff's club.

On April 19, 2017, the Court heard oral argument on the parties' motions.[4] For the reasons stated more fully below, the Court GRANTS Defendants' motion for summary

---

three times the usual limit.

While the Court agrees that Defendants' summary judgment brief could be trimmed of some excess and immaterial verbiage, Defendants quite rightly observe that Plaintiff has named 23 individual officers and the City of Detroit as parties, and that the claims in this case arise from multiple incidents spanning nearly two years. Indeed, through its election to file two separate motions for partial summary judgment, Plaintiff has granted itself the opportunity to submit a total of 46 pages of briefing in support of these two overlapping motions, and it cannot be expected that Defendants could brief their single motion in fewer pages, let alone within the usual 25-page limit. Under these exceptional circumstances, the Court grants Defendants' request to file a 69-page brief in support of their summary judgment motion. Likewise, the Court grants (i) Plaintiff's request to file an overlength 60-page brief in opposition to Defendants' motion, and (ii) Defendants' request to file an overlength 17-page reply brief in further support of their motion for summary judgment.

[4]At the time of the April 19 hearing, the parties had fully briefed all but one of these motions, but Plaintiff had not yet filed a reply brief in support of its most recent motion for partial summary judgment. Nonetheless, Plaintiff's counsel touched upon this motion at the April 19 hearing, and the Court has since had an opportunity to review and consider Plaintiff's reply brief in support of this motion. Thus, the Court will address Plaintiff's most recent motion in the present opinion and order.

judgment, and DENIES each of Plaintiff's three motions for partial summary judgment.

## I.    FACTS

### A.  The Parties

Plaintiff ABCDE Operating, LLC operates the Penthouse Club, an adult cabaret located on Eight Mile Road in Detroit.  According to the complaint, the Penthouse Club "offer[s] adult entertainment including erotic dance to consenting adult[]" patrons.  (Fourth Amended Complaint at ¶ 3.)

Plaintiff's club is subject to a number of municipal regulations governing sexually-oriented businesses, (*see* Defendants' Motion, Ex. 34, Detroit City Code Article XV), including such requirements as (i) securing a "valid sexually-oriented business license," (*id.* at § 5-15-21(a)), (ii) ensuring that each employee obtains a "valid sexually-oriented business employee license" and keeps this license on the premises while the employee is "working, performing or entertaining," (*id.* at §§ 5-15-41(a), 5-15-42(e)), (iii) limiting semi-nude dancers to performing on a "non-portable fixed stage, on which no patrons are permitted, that is at least eighteen (18) inches from the floor in a room of at least six hundred (600) square feet configured and maintained in such a manner that there is an unobstructed view of every area of the room," (*id.* at § 5-15-7(a)(3)), (iv) prohibitions against intentional contact between semi-nude performers and patrons, (*id.* at § 5-15-7(a)(4)), and (v) prohibitions against allowing the business "to become a place for criminal activity" or allowing "the possession, sale, or use of controlled substances or drug paraphernalia on the premises," (*id.* at §§ 5-15-7(a)(6), 5-15-7(a)(14)).[5]  In addition,

---

[5]In a prior suit brought by Plaintiff in 2010, shortly after the Detroit City Council approved extensive amendments to the regulations governing sexually-oriented

because Plaintiff's club serves alcohol, it must comply with liquor laws and regulations enacted by the State of Michigan, including statutory provisions mandating that the club (i) obtain a liquor license, *see* Mich. Comp. Laws § 436.1501 *et seq.,* (ii) secure a topless activity permit, *see* Mich. Comp. Laws § 436.1916, and (iii) make its premises available for "inspection and search" by an investigator from the Michigan Liquor Control Commission ("MLCC") or a law enforcement officer authorized to enforce the MLCC's regulations, Mich. Comp. Laws § 436.1217(2).

The Defendant City of Detroit is a municipal corporation located in Wayne County, Michigan. Each of the 23 individual defendants is or was employed by the Detroit Police Department ("DPD") as a law enforcement officer, and at all pertinent times, James Craig has served as Detroit's Chief of Police.[6] Shortly after he was appointed to this position in July of 2013, Chief Craig reinstituted the DPD's Vice Enforcement Unit ("VEU"), which is charged with inspecting and investigating suspected illegal activity at a variety of Detroit commercial establishments, including sexually-oriented businesses, bars, liquor stores, and gas stations. (*See* Defendants' Motion, Ex. 13, Craig Dep. at 6-7.)[7] Of the 23 individual

---

businesses, Judge Cohn of this District upheld these regulations against a constitutional challenge. *See ABCDE Operating, LLC v. City of Detroit,* No. 10-13435, 2011 WL 3607072, at *2-*4 (E.D. Mich. Aug. 16, 2011).

[6]Chief Craig was named as a defendant in Plaintiff's initial complaint, but he is no longer a party to this suit.

[7]The individual who served as the commanding officer of the VEU following its reinstatement, Lieutenant Charles Flanagan, testified that he was told by Chief Craig and some deputy chiefs that this unit had been reconstituted in light of a number of shootings that had recently occurred in or around "licensed liquor establishments," including a "topless bar," and also because another strip club had been involved in "human trafficking." (Defendants' Motion, Ex. 16, Flanagan Dep. at 16, 30.)

DPD officers named as defendants in Plaintiff's Fourth Amended Complaint, 16 were either members of the VEU or exercised supervisory authority over VEU officers during the time period of relevance here. The remaining seven individual defendants were members of the DPD's narcotics unit during the relevant time period.

## B. The January 18, 2014 Warrantless Entry into Plaintiff's Club

Within a short time after the DPD reinstated the VEU, this unit began conducting enforcement actions at a number of Detroit strip clubs. Plaintiff's club was not among the establishments targeted in these initial VEU operations. Nonetheless, on December 5, 2013, an attorney representing the Plaintiff club and other Detroit-based sexually-oriented businesses wrote a letter to Chief Craig expressing his clients' "substantial concern" about the increasing frequency of DPD investigations of adult cabarets and the conduct of the officers conducting these investigations. (*See* Dkt. 53, Plaintiff's Motion for Partial Summary Judgment, Ex. 10, 12/5/2013 Letter to Chief Craig.)

A few weeks later, on January 18, 2014, the VEU carried out a warrantless enforcement action at Plaintiff's club. (*See* Defendants' Motion, Ex. 8, 1/18/2014 Activity Log and Reports.) DPD officers had received reports of illegal drug transactions at the club, and members of the VEU, along with officers from the DPD's narcotics unit, were dispatched to the club to investigate this alleged activity. (*See* Defendants' Motion, Ex. 15, Greer-Travis 7/26/2016 Dep. at 55-56, 58; Ex. 20, Adams Dep. at 28, 30.) Two DPD officers, Defendant Jason Adams of the VEU and Officer Matthew Bray of the narcotics unit, entered Plaintiff's club in an undercover capacity at approximately 11:40 p.m.,[8] and

_____

[8]Officer Adams consulted a report he prepared that night to determine this time of entry, (*see* Adams Dep. at 20), but the matter is not free from doubt. A video recording

took seats at the bar in order to watch for illegal drug transactions and attempt to purchase narcotics. (*See* Adams Dep. at 20, 28, 36; Greer-Travis 7/26/2016 Dep. at 30, 48.) Officer Adams testified that he was in the club for a half hour or less when he signaled for the other members of the enforcement team to enter. (*See* Adams Dep. at 21.)

The record evidences a degree of confusion as to the basis for the other officers on the enforcement team to enter Plaintiff's club. Officer Adams testified that while he was seated at the bar, a female employee of the club approached him and solicited him for "an act of prostitution," and that he then sent a text message to Sergeant Stacy Greer-Travis, a supervisory officer in the VEU, calling for the other officers to enter the club. (*Id.* at 21-22, 48-49.) Sergeant Greer-Travis testified, in contrast, that the enforcement team entered the club upon receiving a communication from one of the undercover officers indicating that he had made a successful purchase of cocaine. (*See* Greer-Travis 7/26/2016 Dep. at 35, 37, 97-98.) After the team entered the club, however, Sergeant Greer-Travis learned that this belief was mistaken, and that neither of the undercover officers had succeeded in purchasing narcotics. (*See id.* at 37, 98.) Nonetheless, the VEU and narcotics officers remained on the premises and carried out a number of law enforcement activities.

The parties offer divergent accounts as to the nature and extent of these activities. According to Defendants, because the narcotics officers entered Plaintiff's club with the understanding that a drug transaction had taken place, they viewed the operation as a

provided by Plaintiff suggests that this entry occurred at some point prior to 11:32 p.m., but Plaintiff has indicated that the timestamps on its video recordings are not necessarily reliable. In addition, the club's general manager, Edward Muczynski, stated in an affidavit that he was contacted by phone "[s]hortly after 11:00 p.m." and told "that the Club had just been raided." (Dkt. 52, Plaintiff's Motion for Partial Summary Judgment, Ex. 25, Muczynski Aff. at ¶ 6.)

"raid" and secured the premises for approximately 10 to 20 minutes until they located the undercover narcotics officer, Officer Bray, and confirmed that he was safe. (*See* Defendants' Motion, Ex. 28, Geelhood Dep. at 25, 50-51, 54.) The supervisor of the narcotics unit, Sergeant Stephen Geelhood, testified that he "wasn't going to let anybody leave [the club] until" Officer Bray was found and his safety was ensured, but that once this objective was achieved, he was told by Sergeant Greer-Travis that the club patrons were free to leave. (*Id.* at 66-67.) Sergeant Geelhood did not believe that anyone in the club could be described as "detained . . . for any amount of time at all" during this process, nor was he aware that any member of the narcotics unit searched any persons or areas of the club for illegal drugs; rather, the narcotics officers merely "wait[ed] for the vice [unit] to be finished" with its activities. (*Id.* at 49-50.)

As the narcotics officers secured the premises, the VEU officers engaged in a variety of other activities upon entering the club.[9] The female employee who allegedly solicited Officer Adams was taken into custody and given a ticket for solicitation of prostitution. (*See* Adams Dep. at 49; Greer-Travis 7/26/2016 Dep. at 64-66.) One member of the VEU, Officer Starr Gonzales, proceeded upstairs to the women's dressing room and began asking the club's dancers to produce their dance cards for inspection. (*See* Defendants' Motion, Ex. 22, Gonzales 7/29/2015 Dep. at 41-42, 51.) Another officer who accompanied Officer Gonzales, Officer Amy Matelic of the narcotics unit, ran the names of the dancers through the Law Enforcement Information Network ("LEIN") system; Officer Gonzales

---

[9]Sergeant Greer-Travis testified that she would not characterize the VEU's entry into Plaintiff's club as a "raid," and that the VEU instead views such activities as "enforcement actions." (Greer-Travis 7/26/2016 Dep. at 61.)

testified that this was done to "make sure [the dancers] d[id]n't have any outstanding warrants," (Gonzales 7/29/2015 Dep. at 51), but Officer Matelic explained that she used the LEIN system to "make sure that [the dancers] were who they said they were" and to match each dancer with the name on a dance card or piece of identification, (Defendants' Motion, Ex. 29, Matelic Dep. at 26, 36-38).[10]  Officer Gonzales testified that around 20 dancers were detained during this process, but that the dancers were advised that they were free to leave once their identities and dance cards were verified.  (*See* Gonzales 7/29/2015 Dep. at 55-57.)[11]

Another member of the vice unit, Officer Brian Herndon, testified that upon entering Plaintiff's club, he approached the bartenders and wait staff and asked them to produce identification and sexually-oriented business licenses.  (*See* Defendants' Motion, Ex. 24, Herndon Dep. at 47-48.)  Officer Herndon could not recall observing any criminal activity in the club, nor did he issue any tickets for license violations.  (*See id.* at 54-55, 57.)  Finally, Officer Allen Williams of the vice unit testified that he was assigned to go upstairs to the club's so-called "VIP" rooms, based on information that unlawful drug transactions or sexual activity might be occurring in these private areas of the club.  (*See* Defendants' Motion, Ex. 25, A. Williams Dep. at 34, 46.)  Officer Williams stated that he issued a ticket

---

[10]Both officers agreed that the use of the LEIN system was not precipitated by their observation of criminal activity committed by any of the dancers.  (*See* Gonzales 7/29/2015 Dep. at 52; Matelic Dep. at 27-28.)

[11]The record indicates that two dancers were placed under arrest when it was determined that they were named in outstanding warrants.  (*See* Defendants' Motion, Ex. 8, Activity Log and Reports at 12-13.)  A ticket also was issued to a club employee for failure to produce the required sexually-oriented business license, (*see id.* at 35), but it does not appear that this individual was a dancer.

to a club patron who was nude from the waist down, and another ticket to a dancer who was performing topless in a VIP room.  (*See id.* at 47.)

The general manager of Plaintiff's club, Edward Muczynski, offers a somewhat different narrative of the actions taken by the DPD officers at the club that night.  Muczynski states that he drove to the club shortly after 11:00 p.m. upon learning that the facility "had just been raided," but that unidentified DPD officers prevented him from pulling into the club's main parking lot or walking in the front door.  (Dkt. 52, Plaintiff's Motion for Partial Summary Judgment, Ex. 25, Muczynski Aff. at ¶¶ 6-8.)  Upon entering  the club through a private rear entrance and proceeding to the front entrance, Muczynski observed several "masked" and "armed" police officers in the first floor seating area, "some with guns pointed at patrons and [the club's] servers and security personnel."  (*Id.* at ¶¶ 10-11.)  Muczynski then advised an unidentified male officer in a uniform bearing a "vice" insignia that he was the general manager, but this officer pushed him to the side of the first floor bar, ordered him to remain standing with his back to the wall, and warned him that he would be arrested and handcuffed if he moved without permission or attempted to use his cell phone.  (*Id.* at ¶¶ 13-16.)  Likewise, Muczynski observed that several servers and bartenders also were ordered to stand against the wall away from their workstations, and Muczynski was instructed to tell these workers that "if they moved from the wall they would be handcuffed and taken into custody."  (*Id.* at ¶¶ 17-19.)

As Muczynski stood against the wall, he observed "several masked, uniformed and armed individuals in the main sitting area loudly and repeatedly instructing patrons seated in that area to remain in their seats."  (*Id.* at ¶ 20.)  Of the approximately 150 patrons at the club when Muczynski arrived, he witnessed "about fifty patrons" showing identification to

the officers, and several of these patrons were frisked during this process. (*Id.* at ¶ 21.) An unidentified, masked officer then "order[ed] the patrons who had been detained in the main seating area to leave the premises," and Muczynski was told to "shut up" when he protested that these patrons "had not been allowed to cash out while the bartenders and servers were also detained." (*Id.* at ¶¶ 22-23.) At approximately 12:30 a.m., over an hour after Muczynski arrived at the club, an unidentified masked and armed female officer wearing a uniform with a "vice" insignia allowed the music to be restarted and the club's dancers to resume their performances, and Muczynski estimates that "about 75% of the patrons had been ordered or allowed to leave" by that time. (*Id.* at ¶¶ 24, 26.)

As the music and dancing resumed, Muczynski went upstairs to the entertainers' dressing room and observed "about twenty dancers, along with three masked, uniformed and armed female officers." (*Id.* at ¶ 27.) Muczynski witnessed two of these officers "questioning the entertainers and ordering them to retrieve their purses from their lockers," and he further "observed the officers searching through several purses that entertainers had produced on demand." (*Id.* at ¶ 31.) Muczynski then exited the dressing room and "observed a masked, uniformed officer in one of the VIP rooms, who appeared to be searching in and around the furniture in that room," and who then proceeded to search a second VIP room using a flashlight. (*Id.* at ¶¶ 32, 35.) Upon returning to the dressing room shortly before 1:00 a.m., Muczynski found that "fifteen to twenty dancers remained in the dressing room with one masked female officer," and soon thereafter, an officer announced to the dancers in the room that "you should all leave now." (*Id.* at ¶¶ 34, 36.) When Muczynski "asked the dancers not to leave before completing an incident report," an unidentified female officer told him to "shut up," and she directed the dancers to "leave or

get tickets, too." (*Id.* at ¶¶ 36-37.)

According to Muczynski, the masked DPD officers did not leave the club until around 2:00 a.m. (*Id.* at ¶ 39.)  Thus, Muczynski estimates that the club "was prevented from conducting its normal business" for roughly three hours, between 11:00 p.m. and 2:00 a.m. (*Id.* at ¶ 40.)  He further opines that patrons were prevented from leaving the club for about 20 minutes after he arrived, by virtue of the presence of a "large, masked individual holding a handgun" who "physically prevented anyone from exiting except other officers." (*Id.* at ¶ 42.)  In addition, "a substantial majority of the [club's] dancers were not available to perform" for over 90 minutes that night, as they had been "ordered to the entertainers' dressing room and not allowed to leave the room until ordered to leave the premises." (*Id.* at ¶ 43.)

## C. The Additional Warrantless Entries into Plaintiff's Club Following the Commencement of This Suit

On August 15, 2014, Plaintiff and the operators of two other adult cabarets in Detroit brought this suit against Detroit Police Chief James Craig and a number of named and unnamed Detroit police officers.[12]  Since that time, the DPD's VEU has carried out at least three additional enforcement actions at Plaintiff's club.[13]

———————————————

[12]As noted earlier, the two other adult entertainment establishments named in the initial complaint have been voluntarily dismissed as parties, and Chief Craig likewise is no longer a party to this suit.  Moreover, the City of Detroit and a number of individual DPD officers have been added as defendants since the commencement of this suit.

[13]The last such enforcement action that is discussed in the parties' summary judgment briefs occurred on December 3, 2015, but Plaintiff alleges that similar warrantless entries have occurred since that date.  In addition, on March 13, 2015, a single VEU officer, Officer Holly Reed, was accompanied by officers from the U.S. Department of Homeland Security in an undercover investigation of suspected sexual activity occurring in the VIP rooms of Plaintiff's club, as well as reports of human

### (i) July 10, 2015

First, on July 10, 2015 at about 7:30 p.m., approximately eight uniformed DPD officers entered Plaintiff's club without a warrant.  According to the night manager, George E. Gibson, the officers immediately proceeded to the second floor of the club, after first instructing an employee to turn off the music.  (Dkt. 65, Plaintiffs' Response, Ex. E, Gibson Aff. at ¶¶ 6-7.)  The officers summoned Gibson to the entertainers' dressing room, and also ordered all of the dancers to gather in the dressing room.  (*Id.* at ¶¶ 8-9.)  According to Gibson, approximately 25 dancers were in the dressing room when he arrived, and he also observed Sergeant Roderick Tucker, Officer Allen Williams, and an unknown female DPD officer in the room.  (*Id.* at ¶ 10.)  Gibson was asked to provide sexually-oriented business employee licenses for each of the dancers, and he states that the process of verifying these licenses "took approximately five minutes to complete."  (*Id.* at ¶ 11.)  Nonetheless, Gibson states that the dancers were detained in the dressing room after their licenses had been verified, so that the officers could "investigate whether any of the dancers had warrants out for their arrest."  (*Id.* at ¶ 12.)

During this investigation, Sergeant Tucker stated to Gibson that "we are going to shut this place down" and "write a lot of tickets," and both Sergeant Tucker and Officer Williams stated that "you should be happy about the tickets, your boss likes going to court."  (*Id.* at ¶¶ 15, 17.)  Gibson also witnessed these two officers "threaten[ing] the dancers with being jailed for working at" Plaintiff's club.  (*Id.* at ¶ 18.)  In addition, Gibson observed the

_____

trafficking and narcotics.  (*See* Defendants' Motion, Ex. 9, 3/13/2015 Activity Log and Report.)  The parties touch only briefly on this March 13 incident, and Plaintiff does not appear to rely on it in support of its claims, so the Court need not address it any further in this opinion.

unidentified female DPD officer ordering several dancers to retrieve their purses from their lockers and searching through some of these purses. (*Id.* at ¶ 20.) The female officer also inspected the wraps worn by several of the dancers, and issued citations to some of these dancers for wearing wraps that were not "fully opaque" as mandated under a provision of the Detroit City Code. (*Id.* at ¶¶ 21-23.)

Upon leaving the entertainers' dressing room, Gibson saw two uniformed officers inspecting one of the club's VIP rooms. (*Id.* at ¶ 24.)[14] In all, Gibson estimates that the DPD's activities that evening prevented the club from conducting its normal business for about two hours, from shortly after 7:30 p.m. until around 9:30 p.m. (*Id.* at ¶ 25.)[15]

**(ii)     October 24, 2015**

At around 6:20 p.m. on October 24, 2015, Officers Allen Williams and Jeffrey Banks visited Plaintiff's club, as well as other adult cabarets, to determine whether these establishments were still operating private "VIP" rooms. (*See* Defendants' Motion, Ex. 11, 10/24/2015 Activity Log and Reports at 3; *see also* Greer-Travis 7/26/2016 Dep. at 107-

---

[14]The activity log and associated reports of the VEU's activities at the club on the evening of July 10, 2015 indicate that two individuals, a male patron and a female employee, were arrested for gross indecency upon being observed engaging in sexual activity in a VIP room, and that 27 tickets were issued, including five to Gibson, for violations such as allowing sexual activity on the premises, indecent exposure, improper contact between patrons and employees, and failure to produce sexually-oriented business licenses. (*See* Defendants' Motion, Ex. 10, 7/10/2015 Activity Log and Reports.)

[15]In contrast, Sergeant Tucker denied at his deposition that he and his fellow officers disrupted the operation of Plaintiff's club as they checked the dancers' licenses that evening. (*See* Defendants' Motion, Ex. 19, Tucker Dep. at 115-16.)

09.)[16]  A male patron and a female dancer were arrested for gross indecency after being discovered engaging in sexual activity in a VIP room, (*see* 10/24/2015 Activity Log and Reports at 5-9), but no other tickets were issued that evening.  Gibson was at the club that night, and he testified that the DPD officers did not order the music turned off or the lights turned on, nor did they check any dancers' licenses or disrupt any dancers' performances on the club's stages.  (*See* Defendants' Motion, Ex. 31, Gibson Dep. at 49-50.)

### (iii)    December 3, 2015

The final enforcement action addressed in the parties' briefs was conducted on December 3, 2015.[17]  On this occasion, as on January 18, 2014, Sergeant Jason Adams of the VEU[18] and another officer initially entered Plaintiff's club in an undercover capacity to investigate complaints of solicitation and sexual activity in the club's VIP rooms.  (*See* Greer-Travis 7/26/2016 Dep. at 112.)  At some point between 5:30 and 6:40 p.m., the undercover officers notified other members of the VEU that they had observed patrons and dancers entering the club's VIP rooms and engaging in prohibited conduct, and the

---

[16]As Defendants observe, while Plaintiff identifies several additional Defendant officers as having participated in this enforcement action at Plaintiff's club, (*see* Dkt. 52, Plaintiff's Motion for Partial Summary Judgment, Br. in Support at 8), this assertion apparently rests on a misreading of the VEU activity log for the date in question. Although the other officers named by Plaintiff were on duty that day, only Officers Williams and Banks were in the crew assigned to visit adult cabarets and check on the status of their VIP rooms.  (*See* 10/24/2015 Activity Log and Reports at 3.)

[17]Just a few days before this enforcement action, the Wayne County Prosecutor brought a state court suit against Plaintiff's club on November 24, 2015, seeking a declaration that the club was a public nuisance and an order closing the club for up to one year. (*See* Defendants' Motion, Ex. 38, Verified Complaint.)  So far as the record discloses, this action remains pending.

[18]By the time of this enforcement action, Officer Adams had been promoted to sergeant.

remaining VEU officers on the scene then entered the premises. (*See* Defendants' Motion, Ex. 12, 12/3/2015 Activity Log at 2; Dkt. 52, Plaintiff's Motion for Partial Summary Judgment, Ex. 41, 10/17/2016 Evidentiary Hearing Tr. at 10, 19, 78-79.)[19]

Sergeant Tucker has testified that upon entering Plaintiff's club, he observed a number of people smoking cigarettes on the premises, and he then sought out an individual he believed to be the manager on duty, Mike Fawaz, and issued him a ticket for allowing smoking in the club. (*See* 10/17/2016 Evidentiary Hearing Tr. at 13, 15, 19-20.)[20] Another member of the VEU, Officer Donte Jenkins, has testified that when he entered the club that evening, he first checked the bouncers at the door for firearms and generally "made sure everybody was safe," and he then issued a citation to Mr. Fawaz for failing to post his picture at the club as the manager on duty. (*See id.* at 31, 33, 37.)[21] A third VEU officer, Officer Banks, was assigned to check the VIP rooms, and he has testified that he issued

---

[19]The club's general manager, Edward Muczynski, states in his affidavit that ten to twelve DPD officers entered the premises "[s]hortly after 5:30 p.m.," (Muczynski Aff. at ¶ 45), but Sergeant Tucker and Officer Banks have testified that they entered the club at around 6:40 p.m., (*see* 10/17/2016 Evidentiary Hearing Tr. at 10, 67).

[20]There is virtually no deposition testimony in the record concerning the activities of the defendant DPD officers during the December 3, 2015 enforcement action at Plaintiff's club. Rather, much of the Court's account of this incident is derived from the testimony of certain of the defendant officers at a state court evidentiary hearing in the criminal proceeding brought against Mike Fawaz arising from the misdemeanor citations issued to him at the club that evening. As discussed below, in one of its three pending summary judgment motions, Plaintiff seeks to give preclusive effect to a recent state court ruling in Mr. Fawaz's criminal proceeding.

[21]Mr. Fawaz testified at the state court evidentiary hearing that he was not, in fact, the manager on duty at Plaintiff's club that evening, but that he instead was working as a doorman/bouncer. (*See id.* at 96, 101-02.) According to Mr. Fawaz, he notified an unidentified female DPD officer that he was not the club manager, but she responded by telling him to "shut up." (*Id.* at 104, 107.)

citations to a female dancer and a male patron that he discovered in one of these rooms, as well as to Mr. Fawaz for allowing these violations while he was in charge of the club. (*See id.* at 68-69, 71.)[22]

Once again, the club's general manager, Edward Muczynski, has provided a rather different account of the activities of the DPD officers who entered the club on December 3, 2015. According to Muczynski, two uniformed officers proceeded to the main seating area immediately after they entered the club, and they instructed the club's patrons to "remain in their seats and prepare to produce identification." (Muczynski Aff. at ¶¶ 46, 48.) At least some of the patrons were instructed to produce identification and asked whether they were carrying guns, and the officers also frisked some of the patrons. (*See id.* at ¶¶ 50-51.) At around the same time, the music was stopped and the dancers were instructed to report to the second-floor dressing room. (*See id.* at ¶¶ 48-49.)

About 20 to 30 minutes later, Muczynski was summoned to the dressing room, and on his way upstairs, he observed two uniformed officers rummaging around the furniture in one of the VIP rooms and using flashlights to look around this room. (*See id.* at ¶¶ 52-53.) Upon arriving in the dressing room, Muczynski saw more than 20 dancers being questioned by two unidentified female DPD officers, and one dancer who attempted to leave was told to remain "until I tell you you're cleared." (*See id.* at ¶¶ 55-56.) Over the next 30 minutes, Muczynski witnessed the female officers ordering dancers to retrieve their purses from their lockers and inspecting the contents of the purses. (*See id.* at ¶ 56.)

---

[22]The record indicates that citations also were issued to patrons and dancers that evening for such infractions as improper contact between a patron and a dancer and performing at a location other than a fixed stage in an open area. (*See* Defendants' Motion, Ex. 12, 12/3/2015 Activity Log and Citations.)

According to Muczynski, the club's patrons were unable to leave for about 30 minutes after the DPD officers entered the premises. (*See id.* at ¶ 60.) He states that police officers were in control of the club from roughly 6:00 to 7:30 p.m. and that the club was prevented from conducting its normal business during this 90-minute period, particularly since most of the dancers were kept in the entertainers' dressing room "[f]or more than an hour" and were "not allowed to leave." (*Id.* at ¶¶ 58-59, 61.) Muczynski estimates that about 80 patrons were at the club when the police arrived, but that only about 20 patrons remained on the premises by the time the officers left. (*See id.* at ¶ 62.)

## II.  STANDARD OF REVIEW

Through the present cross-motions, Plaintiff and Defendants seek an award of summary judgment in their favor on some or all of the claims asserted by Plaintiff against the Defendant City of Detroit and the individual Defendant police officers.[23] Under the pertinent Federal Rule governing these cross-motions, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

[23]Defendants characterize their motion as brought in part under Fed. R. Civ. P. 12(b)(6), and as seeking the dismissal of certain of Plaintiff's claims for failure to state a claim upon which relief can be granted. Because this motion was filed after the close of discovery, and because the parties' briefs in support of and in opposition to this motion are accompanied by voluminous exhibits that the Court has reviewed and considered in resolving Defendants' motion, the Court views this motion as more properly analyzed under the standards governing a motion for summary judgment.

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

To the extent that a party — here, Plaintiff — seeks an award of summary judgment in its favor on an issue or claim as to which that party bears the burden of proof, the moving party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted). Regardless of the allocation of the burden of proof, the central issue under Rule 56 is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.

R. Civ. P. 56(c)(4).[24]  Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party."  *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

## III.  ANALYSIS

### A.  Plaintiff's Fourth Amendment Claims of Unlawful Warrantless Entries and Unreasonable Searches and Seizures.

The four counts of Plaintiff's fourth amended complaint do not set forth discrete theories of recovery, but instead are distinguished solely by the form of relief they seek: Count One seeks declaratory relief, Count Two requests permanent injunctive relief, and Counts Three and Four seek awards of compensatory damages.  Thus, as Defendants aptly observe, while Plaintiff complains of "many types of unlawful actions" in which Defendants allegedly engaged, "it is not always clear" which of Plaintiff's constitutionally

---

[24]Plaintiff has filed motions to strike certain of the exhibits accompanying Defendants' summary judgment motion and their responses in opposition to Plaintiff's two motions for partial summary judgment.  In support of these motions to strike, Plaintiff argues (i) that Defendants seek to rely on affidavits that include assertions made without the requisite personal knowledge of the affiants, and (ii) that Defendants cite to materials that consist of hearsay or are otherwise ineligible for the Court's consideration in resolving the parties' summary judgment motions.

The Court acknowledges that certain of the materials submitted by Defendants — and by Plaintiff, for that matter — are problematic in their reliance on hearsay or on matters that seemingly lie outside the personal knowledge of the witnesses in question. Nonetheless, rather than issuing a detailed ruling on Plaintiff's motions to strike and specifying precisely which of Plaintiff's objections are well taken and which are not, the Court instead will resolve the parties' summary judgment motions solely by reference to those portions of the record that are eligible for consideration under the standards of Rule 56, and will disregard all other portions of the record.  The Court is confident that its rulings in the present opinion, and the materials on which it has relied in making these rulings, fully comport with the legal standards governing summary judgment motions.

protected rights were violated as a result of these allegedly unlawful activities. (Defendants' Motion, Br. in Support at 28.)   In an effort to overcome this difficulty, Defendants analyze each form of allegedly unlawful conduct in light of the constitutional protection that this conduct seemingly implicates or infringes.  The Court will do likewise, beginning with the actions of the Defendant officers that implicate the Fourth Amendment protections against warrantless entries and unreasonable searches and seizures.

At the outset of its Fourth Amendment analysis, the Court emphasizes the points of law on which the parties agree.   First, all are agreed that the Fourth Amendment's protections against warrantless entries and unreasonable searches and seizures apply to commercial establishments such as Plaintiff's club.  *See Marshall v. Barlow's, Inc.,* 436 U.S. 307, 311-12, 98 S. Ct. 1816, 1819-20 (1978) (holding that "[t]he Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes," and that  the presumption "that warrantless searches are generally unreasonable" likewise "applies to commercial premises as well as homes"); *See v. City of Seattle,* 387 U.S. 541, 543, 87 S. Ct. 1737, 1739 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property.")  The parties further recognize, however, that  a "search" within the meaning of the Fourth Amendment occurs only "when an expectation of privacy that society is prepared to consider reasonable is infringed," and that a business owner or operator has no such "reasonable expectation of privacy in areas of [a commercial establishment] where the public [i]s invited to enter and to transact business."  *Maryland v. Macon,* 472 U.S. 463, 469, 105 S. Ct. 2778, 2782 (1985) (internal quotation marks and citations omitted).   Thus, "[w]hat is observable by the public is observable, without a

warrant, by the Government inspector as well." *Marshall,* 436 U.S. at 315, 98 S. Ct. at 1822 (footnote with citation omitted); *see also Kyllo v. United States,* 533 U.S. 27, 32, 121 S. Ct. 2038, 2042 (2001) (explaining that "visual observation" from a location where the observer is entitled to be "is no 'search' at all"). With these threshold principles in mind, the Court turns to the specific activities challenged by Plaintiff in this case.

### 1. The Entries into Plaintiff's Club Without a Warrant

As recounted above, the VEU carried out four enforcement actions at Plaintiff's club during the time frame of relevance to this suit. On each of these occasions, the VEU officers neither sought nor obtained a warrant that authorized their entry into the club or a search of the premises. Nonetheless, Defendants insist that no warrant was necessary, because each entry occurred when the club was open to the public. The Court agrees.

In *1064 Old River Road, Inc. v. City of Cleveland,* No. 04-3541, 137 F. App'x 760, 762 (6th Cir. June 2, 2005), the plaintiff dance clubs asserted Fourth Amendment and equal protection challenges to the defendant city's inspections of their establishments. The district court granted summary judgment in the city's favor on each of the plaintiffs' claims, and the Sixth Circuit affirmed. Regarding the Fourth Amendment claims, the court found that the clubs had not been searched within the meaning of the Fourth Amendment, explaining that "[s]ince the clubs were open to the public at the time the inspections occurred, they had no expectation of privacy, and the [city] inspectors, no less than ordinary patrons, were free to enter the clubs and observe all that was within plain view." *1064 Old River Road,* 137 F. App'x at 766.

The same result is warranted here. There is no dispute that at the time of each entry at issue, Plaintiff's club was open to the public. Accordingly, the DPD officers involved in

each entry, "no less than ordinary patrons, were free to enter the club[] and observe all that was within plain view." 137 F. App'x at 766.[25]  To be sure, Plaintiff contends that upon entering the club, the officers did not confine themselves to "areas open to the public," but also looked in places that were not "within plain view," 137 F. App'x at 766 — most notably, the club's VIP rooms.  The Court addresses this question below.  As to Plaintiff's threshold challenge that the Defendant officers could not lawfully enter Plaintiff's club without a warrant, the law is clear that no warrant was required under the circumstances presented here.

In a recent motion, however, Plaintiff argues that the Defendant City and certain of the Defendant officers should be precluded from litigating the lawfulness of the December 3, 2015 warrantless entry into Plaintiff's club.  In support of this contention, Plaintiff points to a state court order dismissing the misdemeanor charges brought against a club employee, Mike Fawaz, for alleged violations uncovered by VEU officers in the course of the December 3, 2015 enforcement action.  In Plaintiff's view, the Michigan law of issue preclusion — sometimes referred to as collateral estoppel — prevents the Defendant City

_____

[25]In the January 18, 2014 and December 3, 2015 enforcement actions, undercover DPD officers entered Plaintiff's club in advance of the remaining officers on the scene. This makes no difference to the Court's analysis, however, because it remains the case that Plaintiff had no "reasonable expectation of privacy in areas of the [club] where the public was invited to enter and to transact business." *Macon,* 472 U.S. at 469, 105 S. Ct. at 2782.  Indeed, in *Macon* itself, undercover detectives entered an adult bookstore and purchased magazines that were used to support the defendant's arrest and conviction, but the Supreme Court held that the magazines were not subject to suppression because they were not obtained pursuant to a search or seizure within the meaning of the Fourth Amendment.  *See Macon,* 472 U.S. at 467-71, 105 S. Ct. at 2781-83.  In so ruling, the Court observed that "[t]he use of undercover officers is essential to the enforcement of vice laws," and emphasized that "[a]n undercover officer does not violate the Fourth Amendment merely by accepting an offer to do business that is freely made to the public." *Macon,* 472 U.S. at 470, 105 S. Ct. at 2782.

and the three Defendant officers who issued the misdemeanor citations to Mr. Fawaz from relitigating the issues decided by the state court in its ruling dismissing these charges. The Court cannot agree.

Under well-established principles, this Court must apply Michigan's law of issue preclusion in order to determine the preclusive effect of the state court's ruling upon Plaintiff's federal constitutional claims in this action. *See, e.g., Darrah v. City of Oak Park,* 255 F.3d 301, 311 (6th Cir. 2001); *Strutz v. Hall,* 308 F. Supp.2d 767, 775 (E.D. Mich. 2004). The Michigan Supreme Court has identified three prerequisites to the application of the doctrine of issue preclusion:

> (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel.

*Monat v. State Farm Insurance Co.,* 469 Mich. 679, 677 N.W.2d 843, 845-46 (2004) (internal quotation marks, alterations, footnotes, and citation omitted). The third of these prerequisites, in turn, entails a showing that the party to be estopped was "a party, or in privy to a party, in the previous action." *Monat,* 677 N.W.2d at 846 (internal quotation marks and citations omitted). Mutuality of estoppel is not required, however, where issue preclusion is "asserted defensively against a party who has already had a full and fair opportunity to litigate the issue." *Monat,* 677 N.W.2d at 852.[26]

---

[26]Issue preclusion is invoked "defensively" when a defendant seeks to preclude a plaintiff from relitigating an issue "that the plaintiff ha[s] previously litigated and lost against another defendant." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S. Ct. 645, 650 (1979); *see also Lewis v. City of Detroit,* No. 09-14792, 2011 WL 2084067, at *2 (E.D. Mich. May 24, 2011). The doctrine is used "offensively," in contrast, when "a plaintiff is seeking to estop a defendant from relitigating [an] issue[] which the defendant previously litigated and lost against" another party in an earlier action. *Parklane*

In this case, Plaintiff is seeking to invoke the doctrine of issue preclusion offensively — that is, to preclude the Defendant City and three of the Defendant officers from relitigating an issue that purportedly was decided against these Defendants in the state court proceeding brought against Mr. Fawaz. Accordingly, Plaintiff must satisfy all three of the above-cited prerequisites, including the requirement of mutuality of estoppel. As a number of courts have held, however, police officers are not deemed under Michigan law to be in privity with the prosecution in a state criminal proceeding. *See, e.g., Hardesty v. Hamburg Township,* 461 F.3d 646, 651 (6th Cir. 2006); *Von Herbert v. City of St. Clair Shores,* No. 02-1063, 61 F. App'x 133, 136 n.1 (6th Cir. March 11, 2003); *Burda Brothers, Inc. v. Walsh,* No. 00-1418, 22 F. App'x 423, 430 (6th Cir. Oct. 12, 2001); *Lewis,* 2011 WL 2084067, at *3-*4; *Strutz,* 308 F. Supp.2d at 775-76. "Among the grounds cited in support of this conclusion, the courts have reasoned that police officers lack a personal stake in the outcome of a criminal prosecution, and thus do not have an incentive or opportunity to fully and fairly litigate any issues concerning their conduct during the course of such a proceeding." *Strutz,* 308 F. Supp.2d at 776.[27] Consistent with this uniform weight of

Hosiery, 439 U.S. at 329, 99 S. Ct. at 650; *see also Lewis,* 2011 WL 2084067, at *3.

[27]Plaintiff suggests that this case law is distinguishable because each of the misdemeanor complaints issued against Mr. Fawaz was signed and filed in state court by one of the Defendant officers. According to Plaintiff, these filings alone were sufficient under Michigan law to initiate criminal proceedings against Mr. Fawaz, without the need for a prosecuting attorney to intervene or authorize these proceedings. It follows, in Plaintiff's view, that the three officers who filed these complaints should be deemed in privity with the prosecution in Mr. Fawaz's criminal proceedings.

The Court is not persuaded. First and foremost, Plaintiff has failed to cite even a single case in which issue preclusion was applied offensively to prevent a police officer who testified or was otherwise involved in a prior criminal proceeding from relitigating the lawfulness of the officer's conduct in a subsequent civil suit brought against the

authority, the Court finds the Defendant police officers in this case are not precluded from litigating the lawfulness of their December 3, 2015 warrantless entry into Plaintiff's club.[28]

Moreover, if — as the Court has now held — the rulings of the state court in Mr. Fawaz's criminal proceeding are not entitled to preclusive effect in resolving Plaintiff's Fourth Amendment claims against the individual Defendant officers, Defendants correctly observe that it would be "anomalous and illogical" to give these rulings preclusive effect as

---

officer. This absence of supporting case law is not surprising, given the courts' recognition that police officers "lack a stake in the outcome of a criminal prosecution." *Strutz,* 308 F. Supp.2d at 776; *see also Burda Brothers,* 22 F. App'x at 430; *Glass v. Abbo,* 284 F. Supp.2d 700, 705 (E.D. Mich. 2003).

Even assuming the three Defendant officers arguably had a somewhat greater interest in the outcome of Mr. Fawaz's criminal prosecution by virtue of having filed the complaints that triggered this prosecution, they still lacked any apparent personal incentive to litigate any challenges to their conduct that Mr. Fawaz might have pursued in the criminal proceedings. Nor is there any indication in the record that these officers exercised any control over the prosecutor in Mr. Fawaz's criminal case, such that they would have had an opportunity to present arguments or evidence supporting the lawfulness of their conduct. Accordingly, the Court declines Plaintiff's invitation to expand the boundaries of issue preclusion beyond the limits consistently recognized in the relevant Michigan case law.

[28]In light of this conclusion, the Court need not address Defendants' contentions (i) that the state court in Mr. Fawaz's criminal proceeding did not actually rule on the lawfulness of the December 3, 2015 warrantless entry into Plaintiff's club, and (ii) that even if the state court did so, this ruling was not essential to the ultimate disposition of the charges against Mr. Fawaz.

Notably, even assuming the state court did decide this issue, this would not necessarily satisfy the "identity of issues" prerequisite to the application of issue preclusion. Rather, because the Defendant officers have asserted a qualified immunity defense, the issue before this Court is not simply the lawfulness of the officers' warrantless entry into Plaintiff's club, but instead is "whether an objectively reasonable officer in Defendants' position could have believed it permissible to enter [the club] without a warrant." *Strutz,* 308 F. Supp.2d at 775. "This lack of exact identity of issues precludes the application of [issue preclusion] here." *Strutz,* 308 F. Supp.2d at 775 (citations omitted).

to Plaintiff's claims against the Defendant City. (Dkt. 77, Defendants' Response Br. at 17.) For one, if the Defendant officers are able to demonstrate that they did not violate Plaintiff's constitutional rights, the City likewise would ordinarily be free from liability. *See Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir. 2001). Yet, the application of issue preclusion might lead to the logically inconsistent conclusion that the City *is* liable for a constitutional violation that no individual Defendant officer committed. Moreover, there again is a lack of identity as to the issues arguably decided in Mr. Fawaz's criminal proceeding and the issues bearing on the Defendant City's liability in this suit, where the City is liable for a violation of Plaintiff's constitutional rights only if this violation resulted from the "execution of a [City of Detroit] policy or custom." *Gregory v. Shelby County,* 220 F.3d 433, 441 (6th Cir. 2000). Because no such question of municipal policy or custom was presented in Mr. Fawaz's criminal proceeding, it follows that the state court's rulings cannot foreclose the Defendant City from arguing that it should be free from liability in this case. The Court therefore rejects Plaintiff's appeal to issue preclusion arising from the state court's decision to dismiss the criminal charges brought against Mr. Fawaz.

### 2. The Manner of the Defendant Officers' Entries into Plaintiff's Club

In addition to challenging the legality of the warrantless entries into its club, Plaintiff takes issue with the manner in which these entries were made. In particular, Plaintiff suggests that these entries were rendered unlawful by virtue of (i) the number of officers involved, (ii) the officers being armed, (iii) the officers wearing masks, and (iv) the use of force while entering the club. The Court addresses each of these contentions in turn.

### a. Number of Officers Involved

First, while Defendants prefer to characterize the entries at issue as enforcement actions, Plaintiff points to the number of officers involved as indicative that Defendants were actually engaged in raids designed to uncover evidence of criminal activity. Most notably, the record discloses that thirteen uniformed and two uncover officers participated in the January 18, 2014 entry into Plaintiff's club. In Plaintiff's view, this large number of officers belies Defendants' assertion that warrants were not required to make the entries at issue. Indeed, Plaintiff notes that at least some of the officers involved in the January 18 entry described this incident as a "raid." (*See, e.g.,* Geelhood Dep. at 54.)

Under the record presented here, the Court finds that the number of officers involved in the warrantless entries into Plaintiff's club does not give rise to an issue of fact as to the lawfulness of these entries. First, the case law is clear that police officers do not need a warrant to enter a commercial establishment that is open to the public, *see Macon,* 472 U.S. at 469, 105 S. Ct. at 2782; *1064 Old River Road,* 137 F. App'x at 766, and nothing in these rulings — nor in any other case identified by Plaintiff — suggests that this rule is limited to only the first few officers who enter the establishment. Next, it is immaterial whether some of the entering officers might have thought they were engaged in a raid, because the subjective beliefs of particular officers play no role in assessing the lawfulness of police conduct under the Fourth Amendment. *See Whren v. United States,* 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774 (1996).

Even assuming that the number of officers involved could trigger a Fourth Amendment inquiry into the reasonableness of the manner of entry into Plaintiff's club, the Court agrees with Defendants that the number of officers who participated on each occasion at issue was reasonable as a matter of law. As noted, the largest force was involved in the January 18,

2014 entry, which was precipitated by reports of illegal drug transactions at Plaintiff's club. (*See* Greer-Travis 7/26/2016 Dep. at 58.) Due to these complaints of drug-related activity, seven VEU officers were accompanied by eight members of DPD's narcotics unit, which essentially doubled the size of the force that entered the club that evening. Sergeant Greer-Travis of the VEU testified that these additional narcotics officers were needed to "[h]elp us secure the location," and to assist in investigating in the event that illegal drugs were found at the club. (*See id.* at 56.) Moreover, Defendants point to reports in the record of alleged shootings and assaults at Detroit adult cabarets,[29] and they correctly observe that this heightened risk warranted a larger entry force to ensure the safety of the officers, club patrons, and employees.

Finally, it bears emphasis that Plaintiff's club spans two floors, was serving approximately 150 patrons on the evening of January 18, 2014, and had at least 20 dancers on the premises that evening, along with other club employees. Against this backdrop, it cannot be said that the participation of 15 officers mandates special Fourth Amendment scrutiny of a law enforcement operation that otherwise could have been conducted without a warrant. Moreover, the other entries at issue in this case involved nine officers (on July 10, 2015), two officers (on October 24, 2015), and ten officers (on

---

[29]As noted earlier, Plaintiff has filed a motion to strike various exhibits accompanying Defendants' summary judgment motion, and these reports are among the exhibits that Plaintiff has identified as purportedly ineligible for consideration in resolving Defendants' motion. Specifically, Plaintiff contends that these reports consist largely of inadmissible hearsay, and it also questions the reliability of the information contained in the reports. As Defendants observe, however, these reports may be considered for the limited non-hearsay purpose of showing the state of mind of the Defendant officers as they prepared to enter Plaintiff's club — that is, to show the officers' awareness of reports of past dangerous activities occurring at Plaintiff's club and other Detroit adult cabarets.

December 3, 2015), and Plaintiff again has cited no law suggesting that a force of this size must secure a warrant before entering a commercial establishment that is open to the public.

### b. Armed Officers

Plaintiff next observes that each of the DPD officers who entered its club was armed, contending that this is suggestive of an intent to search for evidence of criminal activity. The record discloses, however, that DPD officers are required to carry their weapons in the course of their duties, (*see, e.g.,* Herndon Dep. at 96), so the carrying of weapons during the warrantless entries at issue here says nothing about the purpose of those entries.

The record further reflects that during the January 18, 2014 operation, Officer Tourville of the narcotics unit carried a shotgun as he entered Plaintiff's club. (*See* Defendants' Motion, Ex. 30, Tourville Dep. at 9-10.) Officer Tourville testified that he maintained this weapon in a "high ready" position "in case I have to use it in defense of myself or my crew if encountering a threat." (*Id.*)[30] Another member of the narcotics unit, Officer Reginald Beasley, similarly testified that the officers are trained to keep shotguns "at a high position," particularly "when you're in a crowded place," so that the weapon could be quickly aimed and fired if necessary and is less likely to be "knock[ed] . . . down," and he confirmed that this is done for purposes of "safety." (Defendants' Motion, Ex. 27, Beasley Dep. at 32-33.) Plaintiff does not contend that the January 18, 2014 warrantless entry was rendered

---

[30]Plaintiff has produced video recordings that show the interior entrance portion of the club on the evening of January 18, 2014. (*See* Dkt. 52, Plaintiff's Motion for Partial Summary Judgment, Exs. 2, 3A.) Although these recordings disclose an officer entering the club with a shotgun, they neither support nor contradict Officer Tourville's testimony that he kept his weapon in a "high ready" position.

unlawful as a result of a single narcotics officer carrying a shotgun, nor does it cite any case law in support of this proposition. Moreover, there is no evidence that any Defendant officer carried a shotgun during any of the other entries at issue in this case.

To be sure, the club's general manager, Edward Muczynski, states in an affidavit that some of the officers who participated in the January 18, 2014 operation had their "guns pointed at patrons and our servers and security personnel." (Muczynski Aff. at ¶ 11.) Yet, he has not identified these officers, and the record sheds no light on this question. It is a well-established principle of federal § 1983 law that "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf,* 601 F.3d 640, 650 (6th Cir. 2010). Thus, even assuming an officer who participated in the January 18, 2014 warrantless entry might have pointed his or her weapon at a club employee, Plaintiff's inability to say which officer might have done so forecloses the imposition of liability on any individual Defendant officer arising from this conduct.[31]

### c. Officers Wearing Masks

Next, Plaintiff seeks to cast doubt on the lawfulness of the Defendant officers' warrantless entries into its club by noting that the officers were wearing masks during the January 18, 2014 operation.[32] As several VEU officers have explained, however, the members of this unit wore masks in order to conceal their identities in case they were called

––––––––––––––––––––

[31]The Defendant City could be charged with liability for this conduct, provided that Plaintiff is able to forge a causal connection between this alleged violation and a municipal policy or custom. The Court addresses this question below.

[32]By the time of the later entries into Plaintiff's club, the VEU had changed its practice and its members no longer wore masks during enforcement actions. (*See* Tucker Dep. at 114; Herndon Dep. at 24-25.)

upon to participate in future undercover operations.  (*See, e.g.* Defendants' Motion, Ex. 16,

Flanagan 11/8/2016 Dep. at 44; A. Williams Dep. at 37-38; *see also* Tourville Dep. at 22-23

(testifying that narcotics officers wore masks for the same reason).)  Again, Plaintiff has not

cited any authority for the proposition that a warrantless entry is rendered especially

problematic under the Fourth Amendment if the officers are wearing masks.  To the

contrary, Defendants cite a case upholding a warrantless entry into a pool hall where

"[a]pproximately seven of the[] twenty-three officers wore black ski masks."  *Ruttenberg v.*

*Jones,* 603 F. Supp.2d 844, 854 (E.D. Va. 2009).

### d.  Forcible Entry

As its final challenge to the manner in which the Defendant officers entered its club,

Plaintiff contends that the officers employed a "dynamic" entry technique and "stormed" the

premises on January 18, 2014, and perhaps also on December 3, 2015, moving rapidly and

using a show of force that, in Plaintiff's view, is inconsistent with a lawful warrantless entry.

The Defendant officers, however, have uniformly testified that they did not forcibly enter

Plaintiff's club on January 18, 2014, (*see, e.g.,* Geelhood Dep. at 26-29; Gonzales

9/18/2015 Dep. at 5-7), and the video recordings submitted to the Court do not suggest

otherwise.  To the contrary, these recordings reveal that the officers entered the club in an

orderly and controlled manner, without running, brandishing any weapons, or shoving

anyone out of the way.  Neither is there any evidence of a forcible entry on December 3,

2015, apart from the statement of Plaintiff's employee, George Gibson, that "approximately

eight uniformed officers of the Detroit Police Department rush[ed] through the vestibule" of

the club and "push[ed] their way past the doorman" that evening.  (Gibson Aff. at ¶ 6.)

The modest measures identified by Gibson do not rise to the level of a forcible entry,

and Plaintiff cites no authority that would indicate otherwise. In addition, Plaintiff has not identified any specific Defendant officer who employed force in entering the club, so there is no basis in the record for imposing liability on any individual Defendant for any purported Fourth Amendment violation arising from the degree of force used in entering Plaintiff's club. Accordingly, this challenge to the manner of the Defendant officers' warrantless entries into Plaintiff's club, like the other similar challenges advanced by Plaintiff, provides no basis for imposing liability on any Defendant officer for a Fourth Amendment violation.

### 3. The Detention and Search of Club Patrons

Plaintiff next contends that the Defendant City and the individual Defendant officers violated the Fourth Amendment by detaining and searching patrons at Plaintiff's club during the January 18, 2014 and December 3, 2015 enforcement actions, and thereby disrupting the club's business on those evenings. As Defendants observe (and Plaintiff does not dispute), Plaintiff cannot vicariously assert the personal Fourth Amendment rights of individual club patrons to be free from unreasonable searches and seizures. *See, e.g., Hamilton v. Lokuta,* No. 92-2361, 1993 WL 460784, at *3 (6th Cir. Nov. 9, 1993); *Crosby v. Paulk,* 187 F.3d 1339, 1345 n.10 (11th Cir. 1999); *Ellwest Stereo Theatres, Inc. v. Wenner,* 681 F.2d 1243, 1248 (9th Cir. 1982). Nonetheless, Plaintiff correctly points out (and Defendants concede) that the Fourth Amendment protects against unreasonable governmental intrusions upon Plaintiff's operation of its business, *see, e.g., Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S. Ct 774, 777 (1970); *See,* 387 U.S. at 543, 87 S. Ct. at 1739, and Plaintiff argues that it has produced evidence in this case of such unlawful interference with its club's operations.

Turning first to the January 18, 2014 warrantless entry, while Defendants deny that

any patrons were searched, (*see, e.g.,* Greer-Travis 7/26/2016 Dep. at 63; Geelhood Dep. at 37, 49), the club's general manager, Edward Muczynski, states that he witnessed "about fifty patrons" showing identification to unidentified police officers and "several" of these patrons being frisked, (Muczynski Aff. at ¶ 21). Similarly, there is a dispute in the record as to how long patrons were detained and how much time passed before the club was allowed to resume its entertainment and service to its patrons. Defendants acknowledge that the club's patrons "were briefly prevented from leaving the Club . . . while the narcotics officers conducted their drug investigation," but they maintain that the video recording of the club entrance reveals that "patrons were entering and exiting the premises as normal" within approximately 20 minutes after the DPD officers entered the club. (Defendants' Motion, Br. in Support at 18.) Defendants also cite the testimony of the Defendant officers that the club's music and dance performances were halted for only about 15 or 20 minutes. (*See* Beasley Dep. at 89-90; Adams Dep. at 61.) Muczynski, in contrast, states (i) that several unidentified officers "loudly and repeatedly instruct[ed] patrons . . . to remain in their seats," (ii) that some of these unidentified officers had "guns pointed" at the patrons and club employees, and (iii) that after about 30 minutes, an unidentified officer ordered "the patrons who had been detained in the main seating area to leave the premises." (Muczynski Aff. at ¶¶ 11, 20, 22.) Muczynski further states that it was over an hour before the DPD officers allowed the music to be restarted and the dancers to resume their performances, and he estimates that "about 75% of the patrons had been ordered or allowed to leave" by that time. (*Id.* at ¶¶ 24, 26.)

While the question is a close one, the Court finds as a matter of law that Plaintiff's Fourth Amendment rights were not violated as a result of the January 18, 2014 detention

of club patrons and disruption of service to these patrons.  First, Defendants correctly point

out that the DPD officers who entered the club that night were entitled, consistent with the

Fourth Amendment, to temporarily detain club patrons and employees in order to secure

the premises and ensure the safety of the officers, patrons, and club employees while

investigating a suspected drug transaction.  *See Michigan v. Summers,* 452 U.S. 692, 702-

03, 101 S. Ct. 2587, 2594 (1981); *Baker v. Monroe Township,* 50 F.3d 1186, 1191-92 (3d

Cir. 1995).[33]  As for the length of the detention and the disruption of service to Plaintiff's

customers, the Court must accept as true, for present purposes, the evidence that patrons

were detained for at least 30 minutes, that some of them were asked for identification and

frisked, and that the club was prevented for over an hour from resuming its normal

operations.   Nonetheless, Defendants cite cases in which the courts have upheld

comparable detentions and business disruptions against Fourth Amendment challenges.

*See, e.g., Palacios v. Burge,* 589 F.3d 556, 559, 565 (2d Cir. 2009) (finding that a detention

was reasonably "limited in duration" in order to investigate a stabbing, where police officers

instructed a nightclub owner to stop the music and carried out a 40-minute process of

escorting all male patrons out of the club and walking them one-by-one past a witness to

---

[33]In its response to Defendants' motion, Plaintiff insists that Defendants' appeal to a suspected drug transaction is an unsupported *post hoc* rationalization of the January 18, 2014 warrantless entry into Plaintiff's club.  (*See* Dkt. 65, Plaintiff's Response Br. at 3-5.)  Yet, Sergeant Greer-Travis has testified that she directed her fellow officers to enter the club upon receiving a communication from one of the undercover officers that she understood as indicating that the officer had successfully purchased cocaine.  (*See* Greer-Travis 7/26/2016 Dep. at 35, 37, 97-98.)  Although Sergeant Greer-Travis conceded that this understanding was mistaken, and that there had been no such successful purchase, (*see id.* at 37, 98), nothing in the record contradicts her testimony as to the belief of the DPD officers, upon their entry into the club, that a drug transaction had occurred.  Plaintiff cites no authority suggesting that the officers acted unlawfully by operating under this assumption until they learned it was mistaken.

the stabbing); *Baker,* 50 F.3d at 1192 (upholding the 25-minute detention of visitors to the site of a drug raid); *Ruttenberg,* 603 F. Supp.2d at 866 (finding that a 54-minute search of a pool hall was not "unduly prolonged," and explaining that by "approximately halfway through" this search, "patrons generally either resumed playing pool or left" the premises).[34]

The cases relied upon by Plaintiff, in contrast, are readily distinguishable. In *Bruce v. Beary,* 498 F.3d 1232, 1244-48 (11th Cir. 2007), the court held that a warrantless administrative inspection of an auto repair shop was unreasonable in its execution, where it "was conducted by 20 officers over a period of eight hours," the officers "entered the [body shop's] office with automatic shotguns and sidearms drawn," and they "searched and detained employees." Likewise, the warrantless nightclub raid under consideration in *Club Retro, L.L.C. v. Hilton,* 568 F.3d 181, 191 (5th Cir. 2009), was carried out by forty police officers, "some outfitted in full S.W.A.T. gear and black ski masks," who "stormed [the club] with shotguns, AR-15 assault rifles, and pistols drawn and pointed at both patrons and employees." That case also featured allegations (i) that one employee was "pushed to the ground with a gun pointed at her head," another employee was "thrown to the ground[] and stepped on," a third employee "was hit on the head with a rifle butt," and other staff members were handcuffed, (ii) that "every patron and employee" was searched and most

---

[34]The Court recognizes the Fourth Amendment concerns implicated by the frisking of club patrons, absent any evidence of individualized suspicion that these patrons might be armed or involved in criminal activity. *See Ybarra v. Illinois,* 444 U.S. 85, 90-96, 100 S. Ct. 338, 341-45 (1979); *Hamilton,* 1993 WL 460784, at *3-*4. As explained earlier, however, Plaintiff cannot vicariously challenge this infringement of the rights of its patrons, except to the extent that it impaired Plaintiff's own business interests. Since the patrons at Plaintiff's club were already being detained, it seems doubtful that the frisking of some of these patrons during this detention added much, if at all, to the disruption of the club's operations.

36

patrons were required "to walk by drug-sniffing dogs," and (iii) that the police "detained the patrons and employees between three and five hours and denied them access to the restrooms for a long period of time." *Club Retro,* 568 F.3d at 192. Needless to say, the present case does not involve anywhere near the lengthy detention, use of force, and widespread searches featured in *Bruce* and *Club Retro.*[35]

Even if the Court were to conclude that issues of fact preclude a determination as a matter of law as to the legality of the detention of Plaintiff's customers and the disruption of Plaintiff's business on the night of January 18, 2014, Plaintiff once again has failed to suggest **which** of the Defendant officers could be charged with liability for any such Fourth Amendment violations. The affidavit of club manager Edward Muczynski does not identify any of the officers who he observed detaining, pointing guns at, and frisking patrons, nor does the record otherwise shed light on this question. Accordingly, no individual Defendant officer is subject to liability for any Fourth Amendment violation arising from these activities.[36]

As for the three other enforcement actions at issue in this case, each involved either a more limited detention of patrons and disruption of club business or none at all. According to the night manager, George Gibson, a club employee was ordered to turn off

[35]A third decision cited by Plaintiff, *Berry v. Leslie,* 767 F.3d 1144 (11th Cir. 2014), was vacated upon the Eleventh Circuit's grant of *en banc* rehearing, *see Berry v. Orange County,* 771 F.3d 1316 (11th Cir. 2014). In any event, *Berry* involved "a tremendous and disproportionate show of force," and the officers in that case entered a barbershop "with guns drawn," they "forced all of the children and other customers to leave" while announcing "that the business was 'closed down indefinitely,'" and they "handcuffed and conducted pat-down searches of the employees." *Berry,* 767 F.3d at 1153.

[36]Again, the Defendant City's potential liability is addressed below.

the music during the July 10, 2015 enforcement action and dancers were summoned to their dressing room, (*see* Gibson Aff. at ¶¶ 7, 9),[37] but there is no evidence that patrons were detained or searched that evening. The October 24, 2015 enforcement action entailed only the investigation of the club's VIP rooms, and Gibson acknowledged that the officers did not order the music turned off or the lights turned on, nor did they disrupt any dancers' performances. Finally, Muczynski has stated that during the December 3, 2015 enforcement action, the club's patrons were detained for about 30 minutes and some of them were frisked and asked to produce identification, but the activities observed by Muczynski that evening were either similarly or less disruptive than the activities he described as occurring in the course of the January 18, 2014 enforcement action. It follows under the Court's earlier analysis that the detention of patrons and disruption of business that occurred during this most recent enforcement action did not rise to the level of violating Plaintiff's Fourth Amendment rights.

### 4. The Inspection of the Club's VIP Rooms

Plaintiff's next claim of a Fourth Amendment violation may be quickly resolved. During each of the enforcement actions at issue here, one or more officers were observed entering the club's VIP rooms, and Plaintiff has produced evidence that on at least some of these occasions, the officers were seen searching in and around the furniture in those rooms and examining them with a flashlight. In Plaintiff's view, this activity exceeded the Defendant officers' authority to enter areas of the club that were open to the public.

---

[37]As noted by Defendants, Gibson contradicted a portion of this statement at his deposition, testifying that the music was not turned off and the lights were not turned on during the July 10 enforcement action. (*See* Defendants' Motion, Ex. 41, Gibson Dep. at 40-41.)

The Court cannot agree. Although the club's VIP rooms were closed off by curtains, they nonetheless were accessible to the public, and it follows that police officers could inspect them without a warrant. Indeed, it is telling that on each occasion at issue here, tickets were issued to patrons for engaging in improper conduct in a VIP room. Given that dancers are prohibited from performing in such curtained-off areas under the Detroit ordinance governing sexually-oriented businesses, it would be surprising if a club such as Plaintiff's could invite its patrons to accompany dancers into VIP rooms and yet insist that these rooms are not open to the public. And as Defendants observe, the courts have found that there is no reasonable expectation of privacy in secluded areas of a public adult entertainment establishment. *See, e.g., Matney v. County of Kenosha,* 86 F.3d 692, 698 (7th Cir. 1996); *Czerniak v. City of Milwaukee,* 669 F. Supp. 247, 249 (E.D. Wis. 1987). Accordingly, the Defendant officers did not violate the Fourth Amendment by conducting warrantless inspections of the VIP rooms in Plaintiff's club.

**5. The Inspection of Dancers' Sexually-Oriented Business Licenses**

As the final apparent basis for its Fourth Amendment claim, Plaintiff contends that the Defendant officers acted unreasonably in the manner in which they carried out their inspections of dancers' sexually-oriented business licenses. In particular, Plaintiff complains that the officers could not enter the dancers' dressing room without a warrant, that dancers were unlawfully detained after their licenses were inspected and for the improper purpose of running LEIN checks, and that officers illegally ordered dancers to produce their purses for searches without probable cause.

First, while it is true that the dancers' dressing room at Plaintiff's club was not a public area that the Defendant officers were free to enter without a warrant, Defendants point out

that Plaintiff expressly consented to the inspection of dancers' sexually-oriented business licenses "in the area of [the club's] locker rooms, or at such other location requested by" Plaintiff. (Defendants' Motion, Ex. 45, 7/10/2008 Letter Agreement at 1.) The parties agreed to this procedure for the express purpose of allowing DPD officers to "perform their [inspection] duties in a manner so as to minimize disruption of [Plaintiff's] business." (*Id.*) Moreover, the City ordinance that mandates sexually-oriented business employee licenses requires that dancers keep their licenses on the premises when they are performing, (*see* Defendants' Motion, Ex. 34, Detroit City Code § 5.15.42(e)), and it surely follows that DPD officers must have the authority to ensure that dancers are complying with this provision.

Plaintiff correctly observes, however, that the same letter agreement cited by Defendants as granting consent to enter the club's dressing rooms further provides that "[t]o avoid disrupting [Plaintiff's] business, the officers will not require that all entertainers be removed from the performance areas at the same time, but will attempt to inspect cards from a small group of dancers, while allowing entertainment to continue to be offered by others." (7/10/2008 Letter Agreement at 1.) Yet, night manager George Gibson states that officers ordered "all dancers to gather in the entertainers' dressing room" during the July 10, 2015 enforcement action so that their licenses could be checked, (Gibson Aff. at ¶ 9), and club manager Edward Muczynski similarly asserts that large numbers of dancers were ordered to the dressing room at the same time during the January 18, 2014 and December 3, 2015 enforcement actions, (*see* Muczynski Aff. at ¶¶ 27, 43, 55, 61). In Plaintiff's view, this unreasonable procedure for inspecting dancers' licenses unlawfully disrupted its business in violation of the Fourth Amendment, particularly in light of the evidence that dancers were not permitted to promptly resume their performing after their licenses had

40

been checked and verified, (*see id.* at ¶ 43, 61). Although the Defendant officers have denied that dancers were detained in the dressing room after their licenses were verified, (*see, e.g.,* Defendants' Motion, Ex. 23, Gonzales 9/18/2015 Dep. at 29-30), the Court must credit Plaintiff's contrary evidence for purposes of deciding Defendants' motion. In addition, the LEIN checks performed during the January 18, 2014 enforcement action further prolonged the dancers' detention, and Officer Gonzales testified that these LEIN checks were done not simply to confirm the dancers' identities, but also to check for outstanding warrants. (*See* Gonzales 7/29/2015 Dep. at 51-53.)

Despite this evidence that the Defendant officers carried out their inspections of the dancers' licenses in a questionable manner, Plaintiff has failed to demonstrate that these questionable practices rise to the level of a violation of Plaintiff's Fourth Amendment rights. As already explained, the issue in this case is not whether the patrons or employees at Plaintiff's club were subject to unreasonable searches or seizures; rather, the question is whether the actions of the Defendant officers violated Plaintiff's Fourth Amendment protection against unreasonable transgressions of its business interests. Accordingly, regardless of whether the Defendant officers could have verified the dancers' licenses more efficiently or through means that were less intrusive upon the privacy and other interests of these dancers, Plaintiff cannot prevail absent a showing that the officers unreasonably disrupted the operation of its club.

The Court finds that Plaintiff has failed as a matter of law to make this required showing. The record, when viewed in a light most favorable to Plaintiff, indicates that the club's dancers were unavailable to perform for about 90 minutes on January 18, 2014 and on July 10, 2015, and for over an hour on December 3, 2015. (*See* Muczynski Aff. at ¶¶

43, 61; Gibson Aff. at 19.) While these disruptions are somewhat longer than the periods of detention and business disruption deemed reasonable in *Palacios, Baker,* and *Ruttenberg, supra,* they are considerably shorter than the several-hour detentions in the cases cited by Plaintiff, *Club Retro* and *Bruce.* Defendants also point to a decision that is more factually on point, *Tanya A. v. City of San Diego,* No. 14-1942, 2015 WL 1197550, at *1-*2, *9 (S.D. Cal. March 16, 2015), in which the plaintiff adult entertainers alleged that their Fourth Amendment rights were violated through an inspection process that lasted two hours and entailed the production of entertainer permits, drivers' licenses, and social security numbers, as well as photographing of the plaintiffs' semi-nude bodies. The court held that the plaintiffs had failed to plead a viable Fourth Amendment claim, observing that they had "offer[ed] no legal support" for their allegations of illegal search and seizure. *Tanya A.,* 2015 WL 1197550, at *9.

The same can be said here. To be sure, the Defendant officers could have acted more expeditiously in verifying the dancers' licenses, and could have allowed the dancers to resume their performing immediately after this process of verification was completed.[38] In addition, the dancers' detention was further prolonged through LEIN checks and searches of purses that arguably transgressed the dancers' Fourth Amendment rights. Yet, these criticisms alone do not establish a violation of Plaintiff's Fourth Amendment rights, and Plaintiff has not pointed to any case holding that a commercial establishment's Fourth

---

[38]As noted, some of the Defendant officers have testified that the dancers at Plaintiff's club were, in fact, allowed to leave the dressing room and resume their performing after their license checks were completed, but the Court must credit Plaintiff's contrary evidence for present purposes.

Amendment rights were violated under facts analogous to those presented here.[39] Consequently, Plaintiff may not go forward with a Fourth Amendment claim premised on purported defects in the process through which the Defendant officers inspected the sexually-oriented business licenses of the performers at Plaintiff's club.

### 6. Municipal Liability

In its foregoing analysis, the Court has rejected the bulk of Plaintiff's claims of Fourth Amendment violations by the Defendant DPD officers. To the extent that the individual Defendant officers did not violate Plaintiff's Fourth Amendment rights, the Defendant City likewise cannot be held liable. *See Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir. 2001) (explaining that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983"). To the limited extent, however, that the Court has found that Plaintiff has produced evidence in support of viable claims of Fourth Amendment violations — albeit without sufficient evidence to permit identification of the particular Defendant officers who committed these violations — the Court must consider whether the record provides a basis for charging the Defendant City with liability for these violations.

Under well-settled principles, the Defendant City "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory,* 220 F.3d at 441 (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)). Rather, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." *Gregory,* 220 F.3d at 441. Moreover, Plaintiff must

---

[39]For this reason, the Defendant officers presumably would be shielded by qualified immunity even if Plaintiff could show that its constitutional rights were violated.

establish that "through its deliberate conduct, the municipality was the 'moving force' behind" the violation of [Plaintiff's] constitutional rights — that is, it "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Gregory,* 220 F.3d at 442 (quoting *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S. Ct. 1382, 1389 (1997)).

The purported customs and policies identified by Plaintiff cannot account for any of the Fourth Amendment violations arguably supported by the record. In its response to Defendants' summary judgment motion, Plaintiff focuses primarily (and repeatedly) on a City of Detroit custom of conducting warrantless entries into adult cabarets without probable cause. Yet, the Court has concluded that each of the warrantless entries at issue here was lawful, notwithstanding the Fourth Amendment presumption that entry into a residence or commercial establishment must generally be authorized by a warrant. Thus, the custom claimed by Plaintiff does not bear upon any Fourth Amendment violation that is supported by the record in this case.

Plaintiff fares somewhat better with its appeal to purported City of Detroit customs of detaining club patrons without particularized suspicion and carrying out inspections of dancers' licenses by detaining all of the dancers in the club's dressing room until this inspection process is fully completed. Nonetheless, the evidence cited by Plaintiff — to the extent that it cites any record evidence whatsoever — would not permit the conclusion that the posited customs exist. First, while Plaintiff points to evidence that patrons were detained and frisked during two of the warrantless entries giving rise to this suit, it has failed to produce any evidence whatsoever that the (unidentified) officers who carried out these

activities were acting pursuant to a municipal custom or policy.

Likewise, in asserting that the Defendant City has a custom of rounding up all of a club's dancers in the dressing room to perform license checks and releasing the dancers only after all of their licenses have been checked and verified, the evidence in support of this claimed custom consists almost entirely of the fact that the Defendant officers conducted license checks in this manner during three of the four entries at issue in this case. Beyond this, Plaintiff points only to the testimony of Officer Allen Williams that when he performs license checks, "all" of the dancers are "brought to one area out of the public view." (A. Williams Dep. at 28.) Even accepting Plaintiff's view that this is tantamount to an "admission" that all dancers are brought to and kept in the dressing room at the same time until all of their licenses are verified, (*see* Dkt. 65, Plaintiff's Response Br. at 59),[40] nothing in the record supports the conclusion that Officer Williams had policymaking authority, or that he was testifying to a practice dictated by policymaking officials or customarily adhered to by all DPD officers. Accordingly, Plaintiff has failed to produce evidence that could forge the requisite causal link between a violation of its Fourth Amendment rights and a City of Detroit custom or policy.

**B.    Plaintiff's First Amendment Claims of Retaliatory Enforcement Actions**

As its remaining theory of recovery, Plaintiff contends that its club was targeted for enforcement actions due to its protected First Amendment activities of (i) providing adult entertainment, and (ii) seeking redress from the courts through the filing of this suit. In

---

[40]This is a dubious reading of Officer Williams' testimony, where he immediately goes on to explain that dancers are free to resume their performances once their licenses have been verified, and that "there's no reason to keep them" beyond this point. (A. Williams Dep. at 28-29.)

seeking summary judgment in their favor on these First Amendment claims, Defendant argues that Plaintiff cannot establish two of the required elements of these claims: (i) that Defendants' actions "injured [Plaintiff] in a way likely to deter a person of ordinary firmness from further participation in [protected] activity," and (ii) that "the adverse action was motivated at least in part by [Plaintiff's] protected conduct." *Center for Bio-Ethical Reform, Inc. v. Napolitano,* 648 F.3d 365, 371 (6th Cir. 2011). The Court agrees that the record does not support the second of these required showings, and it therefore need not address Defendants' remaining challenge.

First, to the extent that Plaintiff asserts that it was targeted for enforcement actions because it offered adult entertainment, the evidence it cites fails to support this proposition. Plaintiff points, in particular, to the testimony of Chief Craig that when he was appointed Chief of Police and determined that the VEU should be reinstated, "one of the things [he] became aware of" was a "variety of complaints" from members of the community "of Vice related activities occurring in the city, whether it was street walking prostitution activity . . . or some of the alleged illegal activity going on in strip clubs." (Craig Dep. at 7-8.) Chief Craig further testified to his "expectation" that the VEU would "conduct investigations . . . [of] Vice clubs," although he did not direct the VEU to target particular clubs in its investigations. (*Id.* at 21.) This testimony, in Plaintiff's view, supports the inference that the VEU targeted adult cabarets for enforcement actions.

Even accepting this reading of Chief Craig's testimony — and overlooking his further testimony that he also expected the VEU to investigate alleged vice-related activity at "liquor establishments, . . . gas stations, [and] liquor stores," as well as "prostitution that occurs out on the public streets," (*id.* at 7) — nothing in this testimony, or elsewhere in the

46

record, supports the conclusion that Chief Craig singled out adult cabarets for enforcement actions ***because of*** their expressive activity. To the contrary, he expressed his expectation that the VEU would target "complained of" locations, which he described as establishments where there were reports of "narcotics being sold on the premises or acts of sex being conducted on the premises," or where VIP rooms were being operated contrary to the City of Detroit ordinance governing sexually-oriented businesses. (*Id.* at 21.) This testimony, in short, singles out establishments for enforcement actions based on complaints of criminal activity, and not expressive activity. There is no evidence, moreover, that the members of the VEU understood Chief Craig, or any other high-ranking DPD official, as directing enforcement actions at establishments based on the sort of entertainment they offered, as opposed to the reports of unlawful activity at those establishments. Indeed, as to the initial January 18, 2014 enforcement action at Plaintiff's club, Sergeant Greer-Travis expressly testified that this operation was motivated by a report of drug sales at the club, (*see* Greer-Travis 7/26/2016 Dep. at 58), and nothing in the record calls this testimony into question or suggests that any other enforcement action at the club was motivated by expressive activity. Accordingly, Plaintiff's claim of retaliation based on its expressive activity of adult entertainment fails for lack of supporting evidence.

As for Plaintiff's claim that its club was targeted for stepped-up enforcement after it filed this suit, this claim rests almost entirely on temporal proximity. Yet, while this suit was filed in August of 2014, the first enforcement action thereafter did not occur until July 10, 2015, nearly a year later, and this considerable passage of time cannot support an inference of retaliatory motive. Apparently recognizing as much, Plaintiff states that the parties did not commence discovery until April of 2015, and that it served notices of the

47

depositions of several Defendant officers on July 7, 2015, just three days before the July 10 enforcement action. Defendants state without contradiction, however, that their counsel did not notify the Defendant officers of Plaintiff's request to depose them until several days after the July 10, 2015 enforcement action. This lack of knowledge defeats Plaintiff's claim of retaliatory motive.

Next, Plaintiff points to the statement of the club's night manager, George Gibson, that Sergeant Tucker and Officer Williams told him during the July 10, 2015 enforcement action that they would write "lots of tickets" so that "you folks will have to come to court," and that "you should be happy about the tickets [because] your boss likes going to court." (Gibson Aff. at ¶¶ 16-17.) These statements, however, are far too vague to support the inference that the July 10 enforcement action was intended as retaliation against Plaintiff's filing of this suit. In addition, even assuming the officers' statements about "going to court" are construed as references to this case in particular, the officers' mere awareness that Plaintiff had filed this suit does not, by itself, serve as an explanation for any action taken by the officers. Certainly, Plaintiff has not pointed to any evidence that this awareness played any role in the decision to conduct the July 10 enforcement action at Plaintiff's club; indeed, Plaintiff does not cite any basis in the record for concluding that Sergeant Tucker or Officer Williams were even involved in this decision. Simply stated, nothing in the statements made to Mr. Gibson forges the requisite causal link between Plaintiff's commencement of this suit and the selection of Plaintiff's club for any ensuing enforcement action.

Nor has Plaintiff produced circumstantial evidence that might assist in establishing this necessary causal connection. Plaintiff attempts no showing that it was treated differently

from other adult cabarets after it filed this suit. Nothing in the record suggests, for example, that once Plaintiff brought this suit, its club was targeted for enforcement actions more frequently than other, similarly situated establishments in Detroit. Consequently, Plaintiff's claim of unlawful retaliation cannot withstand summary judgment.

## IV. CONCLUSION

For these reasons,

The Court hereby GRANTS Defendants' December 14, 2016 motion for summary judgment. (Dkt. 55.) In addition, the Court DENIES Plaintiff's two motions for partial summary judgment filed on December 14, 2016 (Dkt. 52 and Dkt. 53), as well as its motion for partial summary judgment filed on March 20, 2017 (Dkt. 75).

Finally, in accordance with the rulings in this opinion and order, the Court GRANTS the parties' applications and motions for leave to file overlength briefs (Dkt. 54, Dkt. 64, and Dkt. 71), and DENIES Plaintiff's motions to strike (Dkt. 58, Dkt. 59, and Dkt. 66).

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: May 25, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 25, 2017, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager